IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SETH D. HARRIS,[1] | ) | |
| ACTING SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11 C 8688 |
| | ) | |
| SKOKIE MAID AND CLEANING SERVICE, | ) | |
| LTD. and JADWIGA MALEWICKA, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

The U.S. Department of Labor ("the Department") brings this Fair Labor Standards Act

("FLSA") suit against Skokie Maid and Cleaning Service, Ltd. ("Skokie Maid"), as well as its

president and owner, Jadwiga Malewicka ("Malewicka").[2] The Department alleges that, between

2008 and 2011, Malewicka failed to pay seventy-five of her employees minimum wage and

adequate overtime for the work they performed for Skokie Maid. According to the Department's

estimate, Malewicka owes a total of $250,946.72 in unpaid compensation. The Department also

---

[1] Seth D. Harris, Acting Secretary of Labor, has been substituted as the proper plaintiff in this case pursuant to Federal Rule of Civil Procedure 25(d). The Clerk of Court is directed to update the case caption accordingly.

[2] The Court recognizes that the record contains various manners of spelling Malewicka's last name and adopts the spelling from the case caption, which appears to be the correct and most common variation.

seeks an equal amount in liquidated damages, for total damages in the amount of $501,893.44, as well as an injunction preventing Malewicka from further violating the FLSA.[3]

On January 31, 2013, the Department moved for summary judgment on all counts. (Dkt. No. 63.) For the reasons set forth below, the Department's motion is granted in its entirety.

BACKGROUND

Skokie Maid, an Illinois-based domestic employment agency, provides cleaning services to households and businesses throughout north suburban Chicago. (Dkt. No. 64 ("Pl.'s 56.1(a)(3) SMF") ¶ 5.) Skokie Maid is owned and operated by Malewicka. (Id. ¶ 4.)

Malewicka oversees substantially all day-to-day management and operations at Skokie Maid, which includes supervising all pay and employment practices. (Id. ¶¶ 10-12.) The responsibilities of the maids include "sweeping, vacuuming, dusting, polishing, and washing laundry, kitchens, bathrooms, furniture, and floors . . . ." (Id. ¶ 21.) No special skills are required, (id.), and many of the maids speak only Spanish or Polish. (Id. ¶ 16.)

When an individual applies for a maid position, he or she—though Skokie Maid's employees appear to be almost exclusively female (see Dkt. No. 72, Ex. O)—fills out two documents: the "Independent Contractor Application" and the "Independent Contractor Contract." (Pl.'s 56.1(a)(3) SMF ¶ 14.) The application contains non-compete and non-solicitation clauses that state:

---

[3] The court previously entered a default judgment in the amount of $501,893.44 against Skokie Maid on April 26, 2012, and enjoined Skokie Maid from further violating the FLSA at that time. (Dkt. No. 18.) The FLSA's broad definition of "employer" allows for more than one entity or individual to be held liable for violations of the FLSA. *See Falk v. Brennan*, 414 U.S. 190, 195 (1973) (citing 29 U.S.C. 203(d) (definition of "employer")); *see also Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (noting in dicta that an individual supervisor can be held liable for FLSA violations). "[I]f the facts establish that the employee is employed jointly by two or more employers . . . all joint employers are responsible, both individually and jointly, for compliance with [the FLSA's] provisions." 29 C.F.R. § 791.2.

> I agree not to solicit work from any customer while employed at SKOKIE MAID SERVICE. Also, I agree not to solicit any of their customers for at least one (1) year after leaving their employment. In addition, I agree not to compete or work in/for any competing service for one (1) year after my final workday with SKOKIE MAID SERVICE _____! If I violate this Agreement, I promise to pay $2,000 to SKOKIE MAID SERVICE within thirty (30) days of the violation.

(Dkt. No. 68-2, Ex. F-1 ("Application and Contract"), at 1.) The application form goes on to state: "**YOUR REQUIRED DEPOSIT WILL NOT BE RETURNED *IF YOU QUIT* BEFORE 6 MONTHS OF WORK! A 2-WEEK NOTICE IS REQUIRED PRIOR TO TERMINATING EMPLOYMENT**." (*Id.* (emphasis in original).) Malewicka hired a lawyer to enforce the non-solicitation clause against at least one maid, Maria Shauman ("Shauman"), after Shauman stopped working for Skokie Maid in June 2010. (Dkt. No. 70-1, Ex. I ("Shauman Decl.") ¶¶ 4, 36.) In a September 24, 2010 letter to Shauman, Skokie Maid's lawyer listed four customers that had allegedly been solicited by Shauman after her final workday with Skokie Maid, and sought $2,000 from Shauman for each of the four alleged violations. (Dkt. No. 70-6, Shauman Decl., Attach. 5 at 1.)

After maids were hired, Malewicka would occasionally—depending on the maid's experience—provide training. (Pl.'s 56.1(a)(3) SMF ¶ 23.) New maids would work alongside another maid for two or three days, during which time the new maid was not paid. (*Id.* ¶ 24.) Many maids had no other employment besides Skokie Maid, and were financially dependent on Malewicka, who had control over their schedules. (*Id.* ¶¶ 32, 41, 43.) Malewicka would assign clients, work hours, and job sites to the maids. (*Id.* ¶ 32.)

The maids primarily arrived at work through one of two methods: either they were driven by one of three or four van drivers from Skokie Maid's office to the work site, or they drove themselves. (Dkt. No. 68-1 ("Malewicka Dep.") at 37:13-39:16; Pl.'s 56.1(a)(3) SMF ¶¶ 26-27.)

Malewicka sometimes reimbursed maids who drove themselves for gas money. (Pl.'s 56.1(a)(3) SMF ¶ 27.)

After the maids completed their work, they would fill out a form each week which determined their pay. (*Id.* ¶ 29.) The form stated only the maximum number of hours the customer fixed for the job or the amount of money the customer paid for the job. (*Id.*) The maids did not need to provide the total number of hours worked. (*Id.*) Malewicka did not maintain records of the actual hours worked by the maids; her payroll records reflect only the maximum number of hours allotted for the job. (*Id.* ¶ 33.)

Clients paid the maids directly, (*id.* ¶ 35), and the maids would then turn over client payments the next time they were in the office. (*Id.* ¶ 36.) The maids were subsequently paid by Malewicka in cash every week, and were at times given raises of an extra dollar per hour. (*Id.* ¶¶ 30-31.) The maids' compensation was determined exclusively by their hourly rate and the number of hours assigned to the job. (*Id.* ¶ 38.) They were not paid for time spent at Skokie Maid's office, or for time spent traveling between jobsites. (*Id.* ¶¶ 45-46.) Deductions were taken from maids' pay for broken items at client homes or jobsites. (*Id.* ¶¶ 47, 49.)

Between 2007 and 2008, the U.S. Department of Labor's Wage and Hour Division conducted an investigation to determine Skokie Maid's compliance with the FLSA. (*Id.* ¶ 51.) The investigator, Piotr Kisielinski, determined that Skokie Maid had violated minimum wage and overtime pay rules, and consequently owed 74 employees back pay. (Dkt. No. 69-5, Ex. H ("Kisielinski Decl.") ¶ 9.) During the investigation, Skokie Maid provided only time records and work schedules, rather than pay records and hours worked. (*Id.* ¶ 4; Pl.'s 56.1(a)(3) SMF ¶ 53.) The investigator notified Malewicka of his findings, including his determination that the maids

were employees, not independent contractors. (Pl.'s 56.1(a)(3) SMF ¶ 56.) Malewicka made no changes to the way she paid her maids after learning of the investigator's findings. (*Id.* ¶ 58.)

Between 2010 and 2011, the Wage and Hour Division conducted another investigation into Skokie Maid's employment practices. (*Id.* ¶ 59.) The second investigation proceeded along an arc similar to the first: Malewicka did not turn over records including the actual number of hours the maids worked; she argued that the maids were independent contractors; and the investigator found that 36 employees were due $20,065.97 in unpaid minimum wage and 75 employees were due $230,880.75 in unpaid overtime compensation. (*Id.* ¶¶ 60-66.)

PROCEDURAL HISTORY

At a status hearing on January 31, 2013, in Malewicka's presence, the court ordered the Department to file its anticipated motion for summary judgment that same day, after the Department's lawyers deposed Malewicka at the Department's Chicago office. (Dkt. No. 59.) Malewicka was also given a copy of N.D. Ill. Local Rule 56.2 "Notice to Pro Se Litigants Opposing Summary Judgment" at the January 31, 2013 status hearing. (*Id.*) The court scheduled a subsequent status hearing for February 14, 2013, for purposes of scheduling a date for Malewicka's response to the Department's motion, and ordered Malewicka "to be personally present" at the February 14, 2013 status hearing. (*Id.*)

The Department complied with the scheduled deadline and filed its motion, statement of material facts, and supporting memorandum on January 31, 2013. (Dkt. Nos. 63-65.) The next day, on February 1, 2013, the court granted the Department a four-day extension of time to file its supporting exhibits. (Dkt. No. 66; see also Dkt. Nos. 67-86.)

At the February 14, 2013, status hearing, with Malewicka present, the court ordered Malewicka to file her response to the Department's motion by April 15, 2013. (Dkt. No. 88.)

Approximately two months later, on April 11, 2013, Malewicka filed a "Motion for Attorney Assistance" and supporting financial affidavit. (Dkt. Nos. 90, 91.) The court denied Malewicka's motion on April 16, 2013, and sua sponte granted Malewicka a one-week extension of time, until April 22, 2013, to file her response to the Department's motion. (Dkt. No. 92.) Malewicka never filed a response with the court.

<u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the existence of a genuine issue of material fact, the court must view evidence and draw all reasonable inferences in favor of the opposing party. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although the Department's motion for summary judgment is unopposed, the standard of review remains the same. *See Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (applying the same standard of review to the grant of an unopposed motion for summary judgment); Federal Rules of Civil Procedure, Advisory Committee Comments to 2010 Amendments ("[S]ummary judgment cannot be granted by default even if there is a complete failure to respond to the motion.") (discussing Fed. R. Civ. P. 56(e)). Accordingly, the court considers whether the Department's motion and supporting materials show that it is entitled to judgment as a matter of law based on the undisputed material facts in the record. Fed. R. Civ. P. 56(e)(3). Pursuant to Local Rule 56.1, each material fact set forth in the Department's statement is deemed admitted in light of Malewicka's failure to respond. N.D. Ill. Local R. 56.1(b)(3)(C).

<u>DISCUSSION</u>

The primary dispute in this case is whether Skokie Maid is subject to the requirements of the FLSA, and therefore is required to meet the minimum wage and overtime requirements set forth, respectively, in 29 U.S.C. §§ 206 and 207. To make this determination, the court must address three threshold issues: (1) whether Skokie Maid is an "enterprise engaged in commerce"; (2) whether Malewicka is an "employer"; and (3) whether the maids are "employees" rather than independent contractors. *See Solis v. Int'l Detective & Prot. Serv., Ltd.*, 819 F. Supp. 2d 740, 747 (N.D. Ill. 2011) (Kendall, J.). "The interpretation of these employment definitions under the FLSA must be 'broad and comprehensive in order to accomplish the remedial purposes of the Act.'" *Id.* (quoting *Sec'y of Labor, United States Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987)).

I.     <u>Skokie Maid is an "Enterprise Engaged in Commerce"</u>

For the FLSA's minimum wage and overtime provisions to apply to Skokie Maid, the organization must be an "enterprise engaged in commerce or in the production of goods for commerce." *See* 29 U.S.C. §§ 206(a), 207(a)(1). The FLSA defines the term "enterprise" as the "related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units." 29 U.S.C. § 203(r)(1). Malewicka conceded in her answer to the Department's Complaint that Skokie Maid is an enterprise within the meaning of the statute. (Dkt. No. 30 ("Def.'s Answer") ¶ III.) She disputes, however, that Skokie Maid is "engaged in commerce," which is similarly a prerequisite under the FLSA. (*Id.* ¶ IV.)

An enterprise is considered to be "engaged in commerce" for the purposes of the FLSA if: (1) it "has employees engaged in commerce or in the production of goods for commerce, or [ ] has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and (2) its "annual gross volume of sales made or business done" is at least $500,000. 29 U.S.C. § 203(s)(1)(A)(i), (ii).

In this case, Malewicka has admitted that Skokie Maid's annual dollar volume of sales exceeded $500,000 for 2008, 2009, 2010, and 2011, all of the years relevant to this litigation. (*See* Dkt. No. 67-5, Ex. E ("Defs.' Resp. to Pl.'s Req. for Adms.") ¶¶ 1-4.) The only question before the court is, therefore, whether Skokie Maid has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person.

The law is quite clear that domestic workers like Skokie Maid's employees affect commerce within the meaning of the FLSA. The FLSA explicitly states that "the employment of persons in domestic service in households affects commerce." 29 U.S.C. § 202(a). The Department of Labor defines "domestic service employment" to include "employees such as cooks, waiters, butlers, valets, *maids*, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use. 29 C.F.R. § 552.3 (emphasis added).

A Senate Committee Report addressing the 1974 amendments to the FLSA also found that "employees in domestic service employment handle goods such as soaps, mops, detergents, and vacuum cleaners that have moved in or were produced for interstate commerce and also that they free members of the household to themselves [ ] engage in activities in interstate commerce." *See* 29 C.F.R. § 552.99 (citing S. Rep. No. 93-690, at 21-22 (1974)); *see also Int'l*

8

*Detective*, 819 F. Supp. 2d at 747-48 (citing *Brock v. Hamad*, 867 F.2d 804, 808 (4th Cir. 1989)) ("[E]mployees handling out-of-state materials to fulfill job responsibilities can also be sufficient [to establish engaging in commerce].").

In this case, Skokie Maid employs maids who are primarily in the business of cleaning homes. (*See* Malewicka Dep. at 21:18-22:3.) There is substantial evidence that the maids handled goods that traveled in interstate commerce. For example, the maids used cleaning products not manufactured in Illinois. (Pl.'s 56.1(a)(3) SMF ¶¶ 22, 28.) Adhering to the plain language of the FLSA, the statute's legislative history, and the Department of Labor's regulations, the court concludes that Skokie Maid is an enterprise engaged in commerce within the meaning of the FLSA.

II.     Jadwiga Malewicka is an "Employer"

To qualify as an "employer" under the FLSA, an entity or individual must be "acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). In evaluating whether an individual is an employer, courts avoid overly "formalistic labels or common law concepts of agency." *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 785 (N.D. Ill. 2011) (Gilbert, J.) (citing *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)). Instead, they evaluate the "economic reality" of the employment relationship. *See Nehmelman v. Penn Nat. Gaming, Inc.*, 790 F. Supp. 2d 787, 795 (N.D. Ill. 2011) (Finnegan, J.); *Villareal*, 776 F. Supp. 2d at 785.

The "economic reality" evaluation encompasses several factors, including whether the alleged employer: "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Nehmelman*, 790 F. Supp. 2d at

795 (internal quotations and citations omitted). Generally, an individual with "supervisory authority" over a complaining employee who is also "responsible in whole or in part for the alleged [FLSA] violation" will be considered an "employer" for purposes of liability. *Riordan*, 831 F.2d at 694.

By Malewicka's own admission, she was the owner and president of Skokie Maid. (Def.'s Answer ¶ IIB.) She actively supervised the day-to-day operations and management of the company. (*Id.*) When asked during her deposition about the nature of her responsibilities, and what type of work she does at Skokie Maid, Malewicka replied: "Everything that is necessary." (Malewicka Dep. at 11:20-11:24.) She stated that she conducts interviews and hires workers, (*id.* at 16:23-17:8), and determines the schedules for the maids, (*id.* at 11:20-11:24). She further admitted that she directly paid the maids in cash. (Defs.' Resp. to Pl.'s Req. for Adms. ¶ 7.) Finally, she maintains, and has always maintained, the payroll records. (Malewicka Dep. at 16:10-16:22.) Viewing these undisputed facts in the light most favorable to Malewicka, the court concludes that Malewicka is an employer within the meaning of 29 U.S.C. § 203(d).

III.    The Maids are "Employees"

The FLSA also requires an employer-employee relationship. *See* 29 U.S.C. §§ 206, 207. An "employee" is defined as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" means to "suffer or permit to work," 29 U.S.C. § 203(g). A worker's employment status is ultimately a question of law for the court to decide. *Lauritzen*, 835 F.2d at 1535 (citing *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986)).

In answer to the Department's Complaint, Malewicka denied that Skokie Maid has any employees, besides herself, and argued that the maids who work for Skokie Maid are independent contractors, not employees. (Def.'s Answer ¶¶ II(B), III.) Skokie Maid accordingly

requires its workers to fill out paperwork titled "Independent Contractor Application" and "Independent Contractor Contract." (Pl.'s 56.1(a)(3) SMF ¶ 14; *see also* Application and Contract at 1, 2.) The Independent Contractor Application also includes the following explicit language:

> I understand that I am not an employee of SKOKIE MAID SERVICE. I understand that I am an Independent Contractor. I understand that the commission I pay to the company is payment for a variety of services, such as: translation, recording, filing, advertising, appointment records, introductions, etc. I also understand that any time worked beyond 40 hours does not count as overtime and will be paid at the rate agreed upon.

(Application and Contract at 1.)

This contractual language is irrelevant to the court's analysis, however, because the FLSA "is designed to prevent consenting adults from transacting about minimum wages and overtime." *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir. 1986). Skokie Maid's efforts to contract around the FLSA's requirements are therefore legally "ineffectual." *Lauritzen*, 835 F.2d at 1545 (Easterbrook, J.) (concurring). Instead, courts use a six-factor test based on "the 'economic reality' of the situation" to determine whether an arrangement is an employment or independent contractor relationship. *Est. of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565 (7th Cir. 2009) (citation omitted). Thus, as with the "employer" determination under 29 U.S.C. § 203(d), the "employee" determination under § 203(e)(1) eschews form and looks to the true nature of the working relationship. The six relevant factors are:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Lauritzen*, 835 F.2d at 1535. No individual factor is "by itself, or by its absence, dispositive or controlling." *Id.* at 1534.

        1.   <u>Control</u>

"Evidence tends to show control by an employer when it reflects the employer's dominance over the 'manner and method' of how work is performed." *Harper v. Wilson*, 302 F. Supp. 2d 873, 878 (N.D. Ill. 2004) (Denlow, J.). In *Bulaj v. Wilmette Real Estate and Management*, for example, the court—in finding that this factor weighed in favor of "employee" status—considered that the employer was responsible for setting a janitor's "work schedule, monitoring the quality of his work, and disciplining him when his work did not meet [the employer's] expectations." No. 09-cv-6263, 2010 WL 4237851, at *6 (N.D. Ill. Oct. 21, 2010) (Kim, J.). In *International Detective*, the court found that the employer—a security services firm—"controlled" its guards by providing procedures for them to follow in completing their tasks. 819 F. Supp. 2d at 750.

The record shows that Malewicka exerted a great degree of control over the maids working at Skokie Maid. As in *Bulaj*, Malewicka was in charge of scheduling the maids for all of Skokie Maid's clients; she also took care of many of the maids' transportation needs. (Pl.'s 56.1(a)(3) SMF ¶¶ 11-12, 26-27, 32.) When the maids accidentally broke objects while working, Malewicka deducted the cost of the object from the responsible maid's paycheck. (Defs.' Resp. to Pl.'s Req. for Adms. ¶ 26.) Malewicka also withheld two weeks of pay as a form of security deposit that she retained, apparently in the event that the maid quit without giving two weeks' notice or before she had worked at Skokie Maid for six months, or in the event the maid damaged a client's property. (Pl.'s 56.1(a)(3) SMF ¶ 15.)

Further, just as the guards in *International Detective* followed specific procedures, Skokie Maid created detailed and specific cleaning instructions—in English, Spanish, and Polish—for maids to follow as a means of quality control. (*See* Dkt. No. 68-3, Ex. F-2 ("Cleaning Check Point List"); *see also* Pl.'s 56.1(a)(3) SMF ¶ 25 and supporting exhibits.) The checklist contains ten cleaning tasks, including, for example, "Dust shelves and knickknacks," "Shine all chrome items," and "Wipe down all glass and mirrors." (Cleaning Check Point List.)

Based on the undisputed facts, the court concludes that Malewicka exercised significant control over the manner and method in which the maids completed their work.

### 2.  Workers' Opportunity for Profit or Loss

"An independent contractor risks loss of an investment and has the opportunity to increase profits through managerial discretion." *E.E.O.C. v. Cent. Broad. Corp.*, No. 89-cv-5842, 1990 WL 43286, at *4 (N.D. Ill. Mar. 23, 1990) (Conlon, J.) (citation omitted). In this case, the maids were paid a fixed amount for each job. Malewicka had an arrangement in which clients would set a specific number of hours for the maid to work, and then Malewicka would multiply the maids' pre-arranged hourly rate by the pre-arranged number of hours allotted by the client for the work. (*See* Malewicka Dep. at 33:20-36:1.) The maids would be paid this amount regardless of whether they worked more or fewer hours than the allotted time for the job. (*Id.* at 35:17-36:1.)

The undisputed declarations of Skokie Maid's workers demonstrate that Malewicka assigned a specific number of hours to the job, and that maids were told to spend no more or less time completing their tasks. (*See, e.g.*, Shauman Decl. ¶ 30; Dkt. No. 71-1, Ex. J ("Perez Decl.") ¶ 31; Dkt. No. 71-6, Ex. K ("Toledo Decl.") ¶ 29; Dkt. No. 71-8, Ex. L ("Joaquin Decl.") ¶ 30; Dkt. No. 72-1, Ex. M ("Reyes Decl.") ¶ 29; Dkt. No. 72-2, Ex. N ("Salvador Decl.") ¶ 29.) That

is, if Malewicka told a maid to clean for six hours, she cleaned for six hours. She did not have the option to clean for four and then go home early, pocketing the two extra hours' pay. Based on the undisputed evidence in the record, no reasonable trier of fact could conclude that the maids had any meaningful opportunity for profit or loss based on their own "managerial discretion."

### 3. Workers' Investment in Materials or Employment of Workers

"Investment in this instance is understood to be large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself." *Donovan v. Gillmor*, 535 F. Supp. 154, 161 (N.D. Ohio 1982). In this case, there is no evidence that the maids were required to bring anything to the worksites except themselves. The maids did not carry their own bond and liability insurance, or supply their own cleaning supplies or equipment. (*See* Pl.'s 56.1(a)(3) SMF ¶¶ 20, 28, 43.) The maids were also not allowed to employ other workers to complete their tasks. (*Id.* ¶ 44.) This factor weighs in favor of finding that the maids were employees.

### 4. Special Skill

When the work done by an individual requires special skill, that individual is more likely to be an independent contractor. *Lauritzen*, 835 F.2d at 1535, 1537. Not all skills, of course, are special. For example, in *Bulaj*, the individual seeking "employee" status under the FLSA—a janitorial and building maintenance worker—"was responsible for cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters." 2010 WL 4237851, at *7. He received training in "carpentry, plumbing and electrical work," and was responsible for "changing pipes, valves, electrical outlets, and light fixtures, and repairing boilers, windows, and doors at [the employer's] properties." *Id.* In spite of those findings, the court still held that the skill was not sufficiently "special" to tip the balance of this factor in favor

of independent contractor status. *Id.* "Skills are not the monopoly of independent contractors." *Lauritzen*, 835 F.2d at 1537.

While there is some skill involved in effectively and efficiently cleaning homes and businesses, the maids' work surely does not reach the level of complexity discussed above in *Bulaj*, which still did not require special skill. Malewicka admitted as much in a response to an interrogatory concerning the degree of skill necessary for the work done by Skokie Maid's workers. She stated that it required no special skill. (*See* Dkt. No. 67-3, Ex. C ("Def.'s Resp. to Interrogs. (First Set)") ¶ 1E.) The maids' work may be difficult and demanding, but it does not require special skill.

5.   Degree of Permanency in the Working Relationship

"The more permanent the relationship, the more likely the worker is to be an employee." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 309 (4th Cir. 2006). The maids at Skokie Maid worked exclusively for the company. In fact, they each signed an application contract promising "not to compete or work in/for any competing service for one (1) year after [their] final workday with SKOKIE MAID SERVICE." (Application and Contract at 1.) Malewicka cannot have it both ways: that is, she cannot claim that her maids are independent contractors, who would traditionally be free to use their skills wherever they please, and simultaneously prevent them from working for other maid services in the Chicagoland area.[4] *Cf. Figueroa v. Precision Surgical, Inc.*, 423 Fed. App'x 205, 208 (3d Cir. 2011) (unpublished) (holding that an employer could not enforce a non-compete agreement against an independent contractor in part because it

---

[4] Each of the six maids who signed declarations lives in Chicago. (*See* Shauman Decl. ¶ 3; Perez Decl. ¶ 3; Toledo Decl. ¶ 3; Joaquin Decl. ¶ 3; Reyes Decl. ¶ 3; Salvador Decl. ¶ 3.) Undisputed evidence in the record suggests that Malewicka enforced the provisions of Skokie Maid's "Independent Contractor Application" against at least one maid by seeking financial penalties from the maid for her alleged violations of the non-solicitation clause. (Dkt. No. 70-6, Shauman Decl., Attach. 5 at 1.)

treated him like an employee). Six maids attested in their declarations that they did not have their own business, that they were financially dependent on Skokie Maid, and that maids employed by Skokie Maid do not work anywhere else. (Pl.'s 56.1(a)(3) SMF ¶¶ 41, 43.) This factor also weighs in favor of considering the maids employees rather than independent contractors.

6.    Integral Part of Business

"[R]egardless of the amount of work done, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1385 (3d Cir. 1985). Thus, for example, work done by migrant pickle workers has been deemed integral to a business that sold pickles, *Lauritzen*, 835 F.2d at 1537-38, and a field supervisor in charge of supervising security guards has been deemed to do work that formed an integral part of a company engaged in the business of providing security guards. *Harper*, 302 F. Supp. 2d at 879-80.

Here, Malewicka stated in her deposition that Skokie Maid is primarily in the business of "cleaning houses." (Malewicka Dep. at 17:10-17:15.) The maids' primary work involves cleaning precisely those homes. The maids are therefore engaged in work that forms an integral part—indeed, the core part—of Skokie Maid's business.

In light of this analysis, the court finds as a matter of law that the maids are employees within the meaning of 29 U.S.C. § 203(e)(1). Therefore, because Skokie Maid is an enterprise engaged in commerce, because Malewicka is an employer, and because the maids are employees, the FLSA applies and Malewicka was required to pay both minimum wage and overtime to the maids employed by Skokie Maid.

IV.     Back Wages and Damages for Overtime and Minimum Wage Violations

In her filings and appearances before the court, Malewicka never seriously disputed that she did not pay the maids minimum wage or overtime. She merely disputed the notion that the FLSA applied to Skokie Maid, because—she claimed—the maids were independent contractors. The court has determined otherwise, so the next question becomes exactly how much the Department can seek from Skokie Maid and Malewicka.

Under 29 U.S.C. § 207(a), which lays out the overtime rules under the FLSA, employees must be paid at "rate not less than one and one-half times the regular rate" for any hours worked in excess of forty hours in a workweek. 29 U.S.C. § 207(a). Under 29 U.S.C. § 206(a)(1)(C), which provides the rules for minimum wage under the FLSA, employees must be paid at least $7.25 per hour.

In this case, Malewicka did not maintain complete employment or accurate time records. (Pl.'s 56.1(a)(3) SMF ¶ 67.) "[W]here an employer keeps inaccurate or inadequate records, 'an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Solis v. Saraphino's, Inc.*, No. 09-cv-954, 2011 WL 1532543, at *4 (E.D. Wis. Apr. 22, 2011) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Once an employee makes such a showing, the burden shifts to the employer to provide "evidence of the precise amount of work performed or . . . evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, *even though the result be only approximate*." *Anderson*, 328 U.S. at 687-88 (emphasis added).

Consequently, the Department need not prove the exact amount of damages in the context of this motion. In determining damages, the court adopts the calculations made by the Department, which have not been challenged on this summary judgment motion. This court has no reason to doubt the Department's calculations, which were made based on reasonable assumptions and the limited information provided by Malewicka. *See Int'l Detective*, 819 F. Supp. 2d at 753 (adopting Department of Labor calculations where the damages amount was deemed supported by reliable evidence and where contrary facts were not submitted by the employer).

Skokie Maid's records consisted of a total amount of hours that were assigned to each job. The records did not contain the total amount of hours worked by each maid. The practices of the company revealed five major types of violations during the Wage and Hour investigation that produced the estimated unpaid wages: (1) two days of unpaid training, totaling 16 hours' worth of unpaid labor; (2) uncompensated time spent reporting at Skokie Maid's office (2.5 hours of time per week); (3) uncompensated time spent traveling from the office to the first job site (again, 2.5 hours per week); (4) the withheld first two weeks' pay (approximately 60-80 hours, depending on how frequently the maid worked during subsequent weeks); and (5) illegal deductions for breakages. (*See* Dkt. No. 69-1, Ex. G, at ¶ 15; Pl.'s 56.1(a)(3) SMF ¶ 63.) The investigator did not calculate back wages for the maids' missed lunches, or for time spent traveling between work sites, because of both lack of records and variations in practices. (Pl.'s 56.1(a)(3) SMF ¶ 63.)

As a result of the minimum wage violations, 36 employees are due $20,065.97. As a result of the overtime violations, 75 employees are due $230,880.75. Adding together those totals, the actual amount of back wages owed to these employees is $250,946.72.

The Department is also seeking liquidated damages in the same amount as the total amount of back wages due. Under 29 U.S.C. §§ 216(b) and 260, there is a presumption that, absent a showing of good faith and reasonable belief that the employer was in compliance with the FLSA, double damages should be awarded. *See Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1223 (7th Cir. 1995) ("Double damages are the norm, single the exception.") (citation omitted).

In this case, Malewicka disregarded the results of two separate investigations conducted by the Department. (*See* Defs.' Resp. to Pl.'s Req. for Adms. ¶ 45-46; Dkt. No. 69-1, Ex. G, at ¶ 13.) She has failed to meet her burden to prove that she had a good faith belief that Skokie Maid complied with the FLSA. Consequently, liquidated damages in this case are appropriate in the amount of $250,946.72.

V.    Time Records

Malewicka also failed to maintain complete records in violation of the FLSA. Employers subject to the FLSA are required to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c).

Malewicka failed to maintain complete employment or accurate time records. (*See* Pl.'s 56.1(a)(3) SMF ¶ 67.) She logged only the amount of time that she allotted for a job, failing to keep track of the total amount of time her employees worked. (*Id.* ¶ 33, 67.)

VI.    Injunction

A court may issue an injunction to prevent further violations of the FLSA. *See* 29 U.S.C. § 217. Where the Department "has established violations of the statute and there are insufficient assurances that [an employer] will comply with the FLSA in the future, an injunction is

19

appropriate." *Int'l Detective*, 819 F. Supp. 2d at 754; *see also Brock v. Lauritzen*, 649 F. Supp. 16, 18 (E.D. Wis. 1986), *aff'd*, 835 F.2d 1529 (7th Cir.1987) ("In addition, an injunction is appropriate when there are inadequate assurances that a party subject to the provisions of the [FLSA] will comply with the [FLSA] in the future.").

There is no assurance in this case that Malewicka—who ignored the unfavorable results of multiple investigations—is likely to comply with the FLSA absent an injunction. The court therefore holds that the Department is entitled to the injunctive relief sought in its motion for summary judgment and orders the Department to submit an appropriate proposed order for consideration and entry by the court.

<u>CONCLUSION</u>

For the reasons explained above, the U.S. Department of Labor's motion for summary judgment (Dkt. No. 63) is granted. Judgment is entered in favor of the U.S. Department of Labor against defendant Jadwiga Malewicka on all claims. The Department is directed to submit on or before 7/25/13 a proposed "Final Order of Judgment" to Proposed_Order_Holderman@ilnd.uscourts.gov consistent with this opinion and the Department's request that Malewicka be enjoined from violating the minimum wage, overtime, and recordkeeping requirements of the FLSA. The court will rule electronically.

ENTER:

JAMES F. HOLDERMAN
District Judge, United States District Court

Date: July 11, 2013